CHARLES A. GRIMMEL, ADMINISTRATOR, APPELLEE, V. ANNA H. BOYD ET AL., APPELLANTS.

FILED JUNE 26, 1913. No. 17,339.

1. Carriers: PASSENGER ELEVATORS: LIABILITY. "One who installs passenger elevators in his building for the use of his tenants and the public generally is subject to the same degree of care in transporting and protecting his passengers as is imposed upon common carriers." *Quimby v. Bee Building Co.*, 87 Neb. 193.

2. ———: ———: ———. Where the defendants were the owners of the building described in the petition and referred to in the evidence, and maintained and operated therein a passenger elevator for the accommodation of their tenants and persons having business with their tenants, or desiring to call upon them, these facts constituted the defendants common carriers of passengers, and as such common carriers it was their duty, and the duty of their servant, to use the highest degree of care possible, consistent with the practical operation of said elevator, to avoid injury to passengers while being carried from one portion of said building to another.

3. ———: ———: ———. It was the duty of defendants in such case to have some one in charge of the elevator as a conductor, and the said conductor was charged with the duty of exercising on behalf of his employers the highest degree of care possible, consistent with the practical operation of the elevator, with a view to avoiding injury to passengers. In such case it was the duty of the conductor to see that the door to the shaft was not left open.

4. ———: ———: NEGLIGENCE OF PASSENGER: REVIEW. It is the duty of one who approaches the entrance to an elevator to enter the same to exercise that degree of care which a person of ordinary prudence would exercise under like circumstances; and, when the question as to the exercise of such care is properly submitted to the jury, the verdict will not be disturbed.

5. ———: ———: ———: ———. One who attempts to enter an elevator for the purpose of being carried to another part of the building should act with such care as a person of ordinary prudence would exercise under similar circumstances, and, if he fails to do so and his negligence contributes to cause an injury which he receives, the owner of the building is not liable for the damages sustained; and, where the question of the exercise of such care has been properly submitted to the jury and a verdict has been rendered for the plaintiff under evidence which supports it, the verdict should remain undisturbed.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Greene, Breckenridge, Gurley & Woodrough,* for appellants.

*Duncan M. Vinsonhaler* and *W. H. Farnsworth, contra.*

HAMER, J.

Counsel for the appellants are to be congratulated upon the clearness of their contentions. The plaintiff in the court below recovered a judgment against the defendants for damages in a personal injury case, where it is claimed that the plaintiff's decedent was killed by being caused to step into an elevator shaft through the negligence of the defendants. The widow, son and daughter of the late Governor Boyd are made defendants. They are alleged to be

the owners of the Boyd Theatre building in Omaha, which
at the time of the unfortunate tragedy contained 13 or 14
rooms occupied as offices or studios. Of these, the corner
room at the west end of the hall on the fourth floor was
occupied by Mrs. Walter Dale as a studio for instruction
in vocal music. Miss Bessie Chambers, the decedent, had
been Mrs. Dale's pupil for a period of about six months,
and had been going to her studio at 5 o'clock in the after-
noon once a week for that time. There is a passenger
elevator in the building, the entrance to which on the
fourth floor is about 55 feet from the west end of the hall
on that floor, and about 40 feet from the door of Mrs.
Dale's studio. The hallway is about 5 feet wide, and per-
haps 80 feet in length, or a little more. There is a window
in the west end of the hall facing the Y. M. C. A. building
across the street, and another window about 20 feet east of
the elevator on the south side of the hall, which faces
an alley. The entrance to the elevator is similar to the
doors to the offices. The door to the elevator sets into the
north wall of the hall 8 or 10 inches from the outside of
the door casing. The elevator was in charge of a colored
man named Sam Madison. There was an electric light or
lamp in the elevator cage, which it is claimed by the de-
fense was always lighted. On March 16, 1910, Miss Bessie
Chambers was at Mrs. Dale's studio with Miss Mary Ells-
worth. After she had finished her lesson the three ladies,
Mrs. Dale, Miss Ellsworth and Miss Chambers, left the
studio together and walked along the hall east towards the
elevator. It is said that Miss Chambers was on the north
of the hall on the side nearest the elevator, and that Miss
Ellsworth was on the south side of the hall, and that Mrs.
Dale was in the middle, as the three walked abreast toward
the elevator. It was about half past five in the afternoon,
and was growing dark in the hallway. It is claimed by
the defendants that Madison, who was in charge of the
elevator, said nothing to any of the ladies, and that no one
of them said anything to him, also that the ladies saw this
colored man standing at the window which faced to the

south. It is further claimed by the defense that this man **did not** approach the elevator, and that he made no move**ment of** any kind, and that he remained in the position **where** he was when the ladies first saw him near the win**dow** until after the accident happened which resulted in the death of Miss Chambers. It is claimed by the defense **that** Mrs. Dale did not lock her door when Miss Ellsworth **and** Miss Chambers left the studio, and that she was not leaving for the afternoon, and therefore was not herself intending to use the elevator, and that as the three young women walked down the hall from Mrs. Dale's door toward the elevator they were laughing and talking, and that the subject of their conversation was facial massage; that when they got to the elevator entrance, or near it, they stopped; that they could not have seen the opening if they had looked. There is no evidence that Miss Chambers did not see the elevator entrance, or that she had her attention called in any way to the fact that the elevator itself was *not there ready to be entered.* It is further claimed by the defense that Miss Ellsworth did not look to see whether the door to the elevator was opened or closed, and it is claimed that Mrs. Dale saw that the elevator was not there. It is not, however, claimed that Mrs. Dale or Miss Ellsworth called the attention of Miss Chambers to the fact that the elevator was not there. Miss Chambers seems to have been looking toward Mrs. Dale. Just before she stepped into the shaft, where she fell to her death, she said to Mrs. Dale: "You haven't." As she said that, she turned from Mrs. Dale and stepped into the elevator shaft, fell to the bottom of the shaft, and was instantly killed. The door of the elevator shaft was open, and the elevator itself was above the floor.

That the matter may be the better understood, we quote a small part of the evidence from Miss Ellsworth's testimony as to just what transpired at the elevator: "Q. I don't care to go any further with it. When Miss Chambers made this remark of these two words, 'You haven't,' she was looking towards Mrs. Dale? A. Yes. Q. That was

away from the opening into the elevator? A. Yes. Q. And instantly, without looking into the opening of the elevator, she turned and stepped in? A. Yes." Mrs. Dale's statement is as follows: "And as we stood there talking and laughing for a few seconds, I think it must have been inside a half a minute, and I made a little remark, and she laughingly answered me, and turned and stepped quickly into the shaft." Miss Ellsworth testified: "Q. You should say she stepped first before she looked into the shaft? A. Yes; she turned as she stepped, but— Q. The turning and the stepping were about the same time? A. Yes. Q. *She didn't look before she stepped, however, did she?* A. *I don't think so.*" Mrs. Dale testified: "Q. Miss Chambers didn't look toward the opening into the elevator before she stepped into it, did she, Mrs. Dale? A. I didn't see her look. * * * Q. So, if she had looked, turned around and looked at the shaft or the opening into the elevator, she could have seen it; she was where she could have seen? A. You mean I could have seen if she looked? Q. No; *she was where she could have seen if she had looked?* A. Yes. * * * Q. Did I ask you, Mrs. Dale, whether Miss Chambers stepped into the shaft sideways, or did she turn clear around and step in it facing, squarely facing, the shaft? A. My remembrance is she wheeled on her left foot and stepped in with her right. Q. Stepped forward with the right foot? A. Yes."

By a stipulation it appears that Madison was up on the fourth floor. Why he was up there no one seems to know. There is no showing that Miss Chambers saw that the elevator was not there, or that Miss Ellsworth or Mrs. Dale called her attention to the fact that it was not there, or that the light, claimed to be in it, was not shining. The elevator had gone up the elevator shaft. It does not appear that there is any evidence to show why it went up the shaft.

Appellants complain of the eighth instruction, which is as follows: "By negligence of the defendants in this case is meant a failure on the part of the defendants' servant to

exercise that high degree of care required of a common carrier of passengers, as elsewhere defined in instruction No. 4. By contributory negligence is meant any negligence of plaintiff directly contributing to the accident. By ordinary care is meant that amount or degree of care which common prudence and a proper regard for one's own safety required under the circumstances shown in the evidence."

As the fourth instruction was referred to in the eighth, we copy that part of it which we deem material. It is contended by the appellants that they were not negligent in fact, and that they should not have been held to be negligent as a matter of law. It is then contended that the act of Bessie Chambers in stepping into the open elevator shaft was contributory negligence, and that it proximately caused her death.

The door of the elevator shaft was open, and every witness agrees to that. The elevator was not at the bottom of the shaft, and every witness agrees to that. If Madison, the servant employed to run the elevator, had kept it down on a level with the door of the shaft, the accident could not have happened. The fourth and eighth instructions are particularly applicable to this.

In the fourth instruction it is said: "It was the duty of the defendant in this case to have some one in charge of said elevator as conductor, and the evidence establishes that they employed one Sam Madison in that capacity, and he was charged with the duty of exercising on behalf of his employers the degree of care required of a carrier of passengers, as above in this instruction defined; therefore, if you find from the evidence that Madison knew, or in the exercise of the high degree of care required of him ought to have known, that Bessie Chambers or other persons in the building were intending to use the elevator at the time in question, it was his duty to so manage and control said elevator as to avoid injuring any one attempting to enter the same while using ordinary care; and, if you further find from a preponderance of the evidence that said Madison left the door of the elevator shaft open and the elevator

unattended, you should find defendants guilty of negligence; and, if you further find from a preponderance of the evidence that the death of Bessie Chambers was the direct and proximate result of such negligence, and that her next of kin have suffered pecuniary loss in consequence thereof, your verdict should be for plaintiff, provided you do not find that said Bessie was guilty of negligence, as elsewhere instructed, directly contributing in any degree to cause her death."

By instruction No. 8, and also by instructions Nos. 5 and 6, the jury were informed that it was the duty of Bessie Chambers, upon approaching the elevator entrance and entering the same, to exercise that degree of care which a person of ordinary prudence would have exercised for her own safety under the circumstances. This idea is clearly expressed in at least the three instructions mentioned. As we view the matter, the jury were properly charged concerning the rule of contributory negligence. The fourth and eighth instructions, given by the court on its own motion, are models of clearness. It is contended by counsel for appellants, with much force, that when the jury were told that the defendants were negligent because Sam Madison was not within the elevator or at the entrance to it, so as to prevent any person from going into the shaft when the elevator was not there, the issue of Bessie's negligence might as well have been withdrawn from the jury. The man in charge of an elevator is, from the nature of his occupation, required to be continuously on hand. It is his business to see that the door to the shaft is not left open, and that those seeking passage do not fall to their death through his conduct. In this particular case the conduct of Madison, who was in charge of the elevator, would seem to be particularly subject to censure. He had the elevator up on the fourth floor. He left the door to the elevator shaft open and unguarded. He permitted the elevator to climb up the shaft, so that there was nothing to prevent the unfortunate girl, when she stepped into what she supposed was a safe place, from be-

Grimmel v. Boyd.

ing precipitated to the bottom.    The fact that he stood there near the elevator shaft was a sort of guaranty that one might safely step within and find himself standing in the elevator.    In view of the facts, the language of the instruction seems temperate and guarded.    In view of the circumstances of this case, it was probably very difficult for the jury to find otherwise than that Madison left the door of the shaft open and unattended, except that he stood not far away from it, and that he did not call Bessie's attention to the fact that the elevator had gone up the shaft, and that it was a pitfall of death that awaited her if she stepped in.    The main questions were left with the jury. Bessie was required to exercise ordinary care.    If she did not, then she was guilty of negligence.    If she was guilty of negligence that directly contributed to her death, then the defendants were not guilty.    This matter was properly left with the jury, and they found for the plaintiff.

The elevator shaft is a perpetual menace to those who would use the elevator.    No means of public carriage is used so frequently as an elevator.    It is used many times a day, and it is and ought to be the duty of the man who is left in charge of it to protect those who use it, and to see that the elevator itself may be safely entered when it is used, and that it is at the entrance to the elevator shaft so the passenger may step into it.

The fourth instruction is further criticised by counsel for the defendants in this way:    In the fourth instruction it is assumed that Madison had notice of the intention of Bessie Chambers to immediately enter the elevator.    It is then said that there is no evidence that "he had any such notice, and no pretense that she or either of the two ladies with her indicated such purpose."    For what purpose do persons in the fourth story of a building go to an elevator? It would seem that they go there to use it.    The cases of *Knapp v. Jones,* 50 Neb. 490, *Omaha H. R. Co. v. Doolittle,* 7 Neb. 481, *Village of Culbertson v. Holliday,* 50 Neb. 229, and *City of Beatrice v. Forbes,* 74 Neb. 125, are cited, touching the want of ordinary care and contributory negli-

gence. We are unable to accept the views of counsel for the appellants. To us the cases which they cite do not seem to be in point. We find no errors prejudicial to the defendants.

It is contended with great earnestness that the verdict is excessive. Bessie was helping her father and mother in a substantial way. To the mother she gave $25 a month out of her earnings, and to the father she contributed $10 a month toward his support. She assisted in the house-keeping and in the household work. No one may say that she might not in the future provide more for her parents than she was then providing. She was 29 years old, and she was cultivating herself. Each year, perhaps, she would be able to earn a little more than she had earned in the past. We are unable to say that the amount of the verdict is excessive.

The judgment of the district court is

AFFIRMED.

REESE, C. J., LETTON and FAWCETT, JJ., not sitting.